SIXTH DIVISION
December 14, 2007

No. 1-05-1488

| | | |
|---|---|---|
| THE CHICAGOLAND CHAMBER OF COMMERCE, an Illinois not-for-profit corporation; THE CHICAGO DEVELOPMENT COUNCIL, an Illinois not-for-profit association; THE BUILDING OWNERS AND MANAGERS ASSOCIATION OF CHICAGO, an Illinois not-for-profit corporation; FRANK ORSINI; BARBARA CELLINI; CHRIS JACKSON; TRACY HELDT; DAVID O'DONNELL EUGENE BERNSHTEYN; RONALD SMOLEN; MARK REESE; MICHAEL HARLEY; JOHN CASHMAN; ALBERT HANNA; and ANTHONY MORELLI, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division. |
| Plaintiffs-Appellants, | ) ) ) ) | No. 04 CH 16874  Honorable Sophia Hall, Judge Presiding. |
| v. | ) ) ) ) ) | |
| MARIA PAPPAS, Treasurer and Collector of Cook County, Illinois; DAVID ORR, Clerk of Cook County, Illinois; JAMES M. Houlihan, Assessor of Cook County, Illinois; and ILLINOIS DEPARTMENT OF REVENUE, | ) ) ) ) ) ) | |
| Defendants-Appellees. | ) | |

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This case arises out of an effort by the General Assembly, in July 2004, to provide property tax relief through the enactment of an alternative homestead exemption.[1]  Plaintiffs, the

---

[1]This alternative exemption has subsequently expired pursuant to its sunset provision, but has been substantially reenacted, effective October 1, 2007.

No. 1-05-1488

Chicagoland Chamber of Commerce, the Chicago Development Council, and the Building Owners and Managers Association of Chicago (organizational plaintiffs), Frank Orsini, Barbara Cellini, Chris Jackson, Tracy Heldt, David O'Donnell, Eugene Bernshteyn, Ronald Smolen, Mark Reese, Michael Harley, John Cashman, Albert Hanna and Anthony Morelli (individual plaintiffs) appeal from the dismissal of their complaint for declaratory and injunctive relief against defendants Maria Pappas, in her capacity as treasurer and collector of Cook County, David Orr, in his capacity as clerk of Cook County, and James M. Houlihan, in his capacity as assessor of Cook County (defendants), in which they alleged that the General Assembly's effort as enacted was unconstitutional. Plaintiffs contend that the circuit court erred when it determined that their complaint did not state a legally cognizable claim in attempting to demonstrate that section 15-176 of the Property Tax Code (Code) (35 ILCS 200/15-176 (West 2004)) violated the Illinois Constitution by vesting the power to grant property tax exemptions in local governmental units, by authorizing a nonuniform property tax exemption, by authorizing an *ultra vires* "assessment cap" rather than a genuine constitutional exemption, and by making arbitrary and irrational distinctions among homesteads in violation of equal protection. Plaintiffs seek a remand of the counts raising these issues to the circuit court with outright instructions to the court to grant relief to plaintiffs. Plaintiffs further claim that the circuit court erred by failing to recognize that there were factual issues precluding its dismissal of a count in the complaint alleging that plaintiffs' due process rights had been violated by a retroactive increase of their property taxes in 2003. With respect to this claim, plaintiffs ask that we remand for further proceedings in the circuit court. For the reasons that follow, we affirm.

1-05-1488

## BACKGROUND

The Property Tax Code provides for the assessment of property values, the determination of the applicability of statutory exemptions, and the collection of property taxes by officials in Illinois' 102 counties, subject to oversight by the Department of Revenue (Department) and the Property Tax Appeal Board (Board). See 35 ILCS 200/1 *et seq*. (West 2004). These county officials calculate the assessed valuation of each property by first determining whether a property is taxable or entirely exempt and, then, if taxable by determining its fair market value. 35 ILCS 200/9-145 through 9-255 (West 2004). To equalize the assessed valuation of properties throughout the 102 counties, the Code calls for the Department to determine an "equalization factor" for each county following its review of assessment data from each county and its holding of hearings. 35 ILCS 200/17-5 though 17-40 (West 2004). The assessed valuation of each property is then multiplied by that county's equalization factor, as determined by the Department, to produce the equalized assessed valuation of the property. 35 ILCS 200/17-5 though 17-40 (West 2004). Following the determination of a property's equalized assessed valuation, county officials determine whether the property is eligible for any statutory exemptions. 35 ILCS 200/15-5 through 15-180 (West 2004). The actual taxable value of the property is then determined by subtracting the statutory exemptions for which the property is eligible from its equalized assessed value. 35 ILCS 200/15-5 through 15-180 (West 2004).

The determination of properties' taxable value is only one step in the process of determining how much tax shall be assessed to property owners. Various statutes outside the Code permit various taxing districts, such as municipalities, counties, townships and school

districts, to levy taxes. See 35 ILCS 200/18-10, 18-15 (West 2004). The taxing districts submit their levies to their respective county clerks. 35 ILCS 200/18-40, 18-45 (West 2004). The clerks, in turn, calculate the tax rate required to meet the levies by dividing the total taxable value of all the property in the taxing district. 35 ILCS 200/18-40, 18-45 (West 2004). As almost all statutes authorizing the taxing districts to levy taxes include a maximum tax rate, the clerks then ensure that the proposed tax levy will not require a tax rate in excess of the maximum rate available by statute. 35 ILCS 200/18-105 (West 2004). The clerks then apply the tax rate to the taxable value of each piece of property that is both within the taxing district and the clerk's county. 35 ILCS 200/18-40, 18-45 (West 2004).

Under the Code, Cook County is divided into three assessment districts. 35 ILCS 200/9-220 (West 2004). District One encompasses the City of Chicago; District Two covers suburban Cook County north of North Avenue; and District Three covers suburban Cook County south of North Avenue. 35 ILCS 200/9-220 (West 2004). As with the borders between taxing districts and counties throughout the state, the boundaries of the various taxing districts and the three assessment districts of Cook County are not contiguous. Moreover, some taxing districts cut across more than one of the three assessment districts.

Cook County, pursuant to article IX, section 4(b) of the Illinois Constitution (Ill. Const. 1970, art. IX. §4(b)) has enacted an ordinance classifying real property and imposing specific assessment rates on those different classifications (Cook County Real Property Assessment Classification Ordinance, Cook County Code of Ordinances, ch. 74, §63 (2006)). For example, most residences are classified as Class 2 and are assessed at 16% of their fair cash value; large

residential apartment buildings are classified as Class 3 and are assessed at 28% of their fair cash value; and most commercial and industrial property is placed in Class 5 and assessed at either 36 or 38% of its fair cash value. Throughout the rest of the state, however, all properties are assessed at 33 1/3% of their fair cash value. 35 ILCS 200/9-145 (West 2004).

In July 2004, section 15-176 was added to the Code and a new exemption structure effecting the equalized assessed value of homestead properties went into effect. See Pub. Act 93-715, eff. July 12, 2004. Code section 15-176 provided, in pertinent part:

> "(a) For the assessment years as determined under subsection (j), in any county that has elected, by an ordinance in accordance with subsection (k), to be subject to the provisions of this Section in lieu of the provisions of Section 15-175, homestead property is entitled to an annual homestead exemption equal to a reduction in the property's equalized assessed value calculated as provided in this Section.

> * * *

> (e) The amount of the exemption under this Section is the equalized assessed value of the homestead property for the current tax year, minus the adjusted homestead value***." 35 ILCS 200/15-176(a), 15-176(e) (West 2004).

Under the new Code section, "adjusted homestead value" was defined as:

> "(A) The property's base homestead value increased by 7% for each

1-05-1488

tax year after the base year through and including the current tax year, or, if the property is sold or ownership is otherwise transferred, the property's base homestead value increased by 7% for each tax year after the year of the sale or transfer through and including the current tax year. The increase by 7% each year is an increase by 7% over the prior year. (B) The property's equalized assessed value for the current tax year minus (i) $4,500 in Cook County or $3,500 in all other counties in tax year 2003 or (ii) $5,000 in all counties in tax year 2004 and thereafter." 35 ILCS 200/15-176(b)(2)(A), 15-176(b)(2)(B) (West 2004).

Section 15-176, in turn, defined "base homestead value" as:

"(A) Except as provided in subdivision (b)(3)(B), 'base homestead value' means the equalized assessed value of the property for the base year prior to exemptions, minus (i) $4,500 in Cook County or $3, 500 in all other counties in tax year 2003 or (ii) $5,000 in all counties in tax year 2004 and thereafter, provided that it was assessed for that year as residential property qualified for any of the homestead exemptions under Sections 15-170 through 15-175 of this Code, then in force, and further provided that the property's assessment was not based on a reduced assessed value resulting from a temporary irregularity in the property for that year. Except as provided in subdivision (b)(3)(B), if the property did not have a residential equalized assessed value for the base year, then 'base

-6-

1-05-1488

homestead value' means the base homestead value established by the assessor under subsection (c)." 35 ILCS 200/15-176(b)(3)(A) (West 2004).

The new Code section limited the full benefit of its new, alternative exemption to existing owners or to persons who acquired a homestead through an intrafamily transfer, providing:

"(B) If the property is sold or ownership is otherwise transferred, other than sales or transfers between spouses or between a parent and a child, 'base homestead value' means the equalized assessed value of the property at the time of the sale or transfer prior to exemptions, minus (i) $4,500 in Cook County or $3,500 in all other counties in tax year 2003 or (ii) $5,000 in all counties in tax year 2004 and thereafter, provided that it was assessed as residential property qualified for any of the homestead exemptions under Section 15-170 through 15-175 of this Code, then in force, and further provided that the property's assessment was not based on a reduced assessed value resulting from a temporary irregularity in the property.

* * *

(h) In the event of a sale or other transfer in ownership of the homestead property, the exemption under this Section shall remain in effect for the remainder of the tax year in which the sale or transfer occurs, but

-7-

(other than for sales or transfers between spouses or between a parent and a child) shall be calculated using the new base homestead value as provided in subdivision (b)(3)(B). The assessor may require the new owner of the property to apply for the exemption in the following year." 35 ILCS 200/15-176(b)(3)(B), 15-176(h) (West 2004).

On July 13, 2004, Cook County opted into the new, alternative exemption scheme under section 15-176. See Pub. Act 93-715, eff. July 12, 2004. Under that section, the new, alternative exemption would be phased in differently between Cook County and the remaining counties in the state. For most counties, that assessed properties annually, the exemption would apply for three years following the next annual assessment. Section 15-176 provided:

"In counties with 3,000,000 or more inhabitants, the provisions of this Section apply as follows:

(1) If the general assessment year for the property is 2003, this Section applies for assessment years 2003, 2004, and 2005. Thereafter, the provisions of Section 15-175 apply.

(2) If the general assessment year for the property is 2004, this Section applies for assessment years 2004, 2005, and 2006. Thereafter, the provisions of Section 15-175 apply.

(3) If the general assessment year for the property is 2005, this Section applies for assessment years 2005, 2006, and 2007. Thereafter,

the provisions of Section 15-175 apply." 35 ILCS 200/15-176(j)(1), (j)(2), (j)(3) (West 2004).

However, since Cook County assessed properties triennially, the alternative exemption would be phased in among Cook County's three assessment districts over five years. The new exemption was applicable to Assessment District 1 between tax years 2003 to 2005; to Assessment District 2 between 2004-2006; and to Assessment District 3 between 2005-07. See 35 ILCS 200/15-176(j)(1), (j)(2), (j)(3) (West 2004).

On October 13, 2004, the organizational plaintiffs and seven of the individual plaintiffs filed their complaint against defendants. Following the intervention of the Illinois Department of Revenue in the litigation, the current organizational and individual plaintiffs filed their second-amended, five-count complaint (the complaint) on December 23, 2004.

In the complaint, the organizational plaintiffs identified themselves as lessees of office space in Chicago. Each indicated that its lease required it to pay for any increases in property taxes on the buildings in which its office was located.

Heldt identified herself as a homeowner in a municipality located in Washington Township in Will County. She identified her taxing district as the Prairie State Community College District, which levies real estate taxes on property in both Will and Cook Counties.

Orsini and Cellini identified themselves as south suburban homeowners and business owners in south suburban Cook County. Their homes were classified as Class 2 residential property, whereas their businesses were classified as Class 5 commercial property, for real estate tax purposes. Both received a homestead exemption against the property taxes levied against

their homes in tax year 2002.

O'Donnell identified himself as a homeowner in a municipality in Orland Township in Cook County. His home was classified as Class 2-78 residential property and he received a homestead exemption in tax year 2002.

Jackson identified himself as owning Class 5-17 commercial property in Arlington Heights, a municipality in Wheeling Township, Cook County.

Bernshteyn identified himself as a Chicago homeowner whose home was classified as Class 2-95 residential property. He purchased his home in June 2004 and alleged that he could not have known that the legislature would retroactively attach tax consequences on his purchase.

Smolen identified himself as a homeowner in a municipality in Niles Township. His home was classified as Class 2-05 property and he received a homeowner's exemption for his home in tax year 2003. He also owned a four-unit, Class 2-11 apartment building in Lakeview Township.

Harley owned a home in a municipality in Rich Township, which he purchased in 2002. He received a homeowner's exemption for tax year 2003, but was unable to employ the legislative cap limiting any increases on the assessed value of his home to a maximum of a 7% increase.

Cashman owned a home in Will County. His home was situated within the boundaries of several taxing districts that included land within both Cook and Will Counties.

Reese identified himself as a homeowner in the City of Chicago, Lake Township. He purchased his home in 2004 and it was classified as Class 2-99 residential property.

Hanna was also a Chicago homeowner. His home was classified as Class 2-06 residential property, and he received a homestead exemption on the property for tax year 2003. Hanna also

owned two separate apartment buildings in Chicago, the first was classified as Class 3-97 commercial property and the second as Class 3-15 commercial property.

Finally, Morelli identified himself as a River Forest homeowner, as well as an owner of multiple businesses in Chicago, Elmwood Park, and Des Plaines. His home was classified as Class 2-04 residential property, and he received a homestead exemption for it in tax year 2003. At least some of his business properties were classified as Class 5-17 properties.

In the first count of the complaint, plaintiffs alleged that the amended section 15-176 of the Code unconstitutionally delegated the exclusive power of the General Assembly to the counties to create an alternative homestead exemption. Similarly, in count III of the complaint, plaintiffs alleged that the "exemption" provided in amended section 15-176 did not, in fact, operate as an "exemption" but rather as a "property assessment inflation cap" which, they contended, was *ultra vires* since the General Assembly was not constitutionally empowered to create anything to address property tax relief except for homestead exemptions. Count II of the complaint complained that the new exemption scheme contained in amended section 15-176 created constitutionally infirm nonuniform real property taxation in that it was only in force in Cook County, and in that it did not apply uniformly to all places of principal residence, in particular as between Cook County's various assessment districts and as between current owners and subsequent homestead purchasers. Count IV complained that these nonuniformities violated the constitution's equal protection clause and that, since section 15-176 only benefitted Cook County, it amounted to special legislation. Finally, count V alleged that the anticipated employment of the new, variable homestead exemption to tax year 2003 would amount to the

implementation of retroactive legislation in violation of constitutional due process. As relief, plaintiffs requested a declaration that amended section 15-176 was unconstitutional, null and void, plus the recalculation of 2003 tax bills to exclude the application of the exemption under section 15-176, and to enjoin any future application and enforcement of the exemption under amended section 15-176. Alternatively, plaintiffs requested a remand to allow for the factual development necessary to prove their due process claim.

Defendants moved to dismiss the complaint on January 18, 2005. Defendants contended that plaintiffs failed to state a claim in their complaint. With respect to plaintiffs' nondelegation argument in count I, defendants argued that the General Assembly had not delegated its exclusive power to create homestead exemptions but, rather, had merely provided an alternative method of calculating the general homestead exemption. Defendants further argued that, in any event, the Illinois Constitution did not bar such a delegation and that the new alternative exemption constituted a valid local option statute. With respect to count III, defendants argued that the constitution placed broad discretion within the General Assembly surrounding the creation and form of homestead exemptions and that the new calculation method set forth in section 15-176 was a valid exercise of that discretion. Regarding plaintiffs' uniformity challenge, contained in count II, defendants argued that the only promise of the uniformity clause was that properties within the same class of property within the same taxing district be taxed uniformly. They further contended that the clause did not require "absolute equality" in property taxation, but only "practical uniformity." They argued that since the alternative homestead exemption applied uniformly within the established class of homesteads in Cook County, that exemption was

practically uniform. Addressing the claim of count IV, that the new exemption of section 15-176 violated equal protection, the defendants first argued that it was an established legal principle that constitutional equal protection was established if a taxing scheme satisfied the uniformity clause. They further noted that our supreme court had, in another context, previously found that any disparity in treatment caused by the gradual phasing in of taxes across the assessment districts of Cook County was not offensive to equal protection. Surrounding the plaintiffs' retroactivity challenge in the complaint's final count, defendants argued that the law was not, in fact, applied retroactively in that the equalized assessment values, from which the exemptions would be subtracted, were not determined until after passage of section 15-176. They further contended, after noting that there was no vested right in a particular tax rate, that any retroactive effect was not so "harsh and oppressive" as to violate due process.

The Department, likewise, moved to dismiss plaintiffs' complaint. The Department's arguments largely mirrored those of defendants. Significantly, however, respecting plaintiffs' uniformity challenge, the Department argued that the Illinois Constitution did not even intend for the uniformity clause to apply to the clause permitting the General Assembly to create homestead exemptions. The Department further argued, with respect to plaintiffs' argument that the General Assembly had impermissibly created an inflation cap, rather than a constitutionally permissible homestead exemption, that any measure that reduced the assessed value of homes necessarily met the definition of a homestead exemption and comported with the purpose of such exemptions, namely, to prevent homeowners from losing their homes on account of steeply rising property taxes.

Plaintiffs filed a joint response to defendants' and the Department's motions to dismiss. By way of summary, in support of their delegation challenge, plaintiffs argued that in article IX, section 6, the constitutional drafters' provided that "the General Assembly by law may grant homestead exemptions." They contended that by employing the word "grant," as opposed to using a phrase such as "may authorize" or "may provide for" certain measures by law, the intent of the drafters was to require direct action by the General Assembly rather than to delegate vicarious action by any subordinate political bodies. Plaintiffs contended that the clause allowing the General Assembly "to grant homestead exemptions" restricts the legislature to limited, narrow and specific power with respect to such legislation, rather than adds to its general legislative authority to provide homestead exemptions. Thus, the normal powers that would apply to legislative delegation would not be operative with regard to exemption enactments.

Plaintiffs further argued that the clause allowing the General Assembly to grant homestead exemptions must, logically, be read to restrict that power to the legislature because, since the Illinois Constitution recognized the general taxing authority of the General Assembly where the Revenue Article (Ill. Const. 1970, art. IX, §6) was otherwise silent, there would have been no need to draft a specific clause empowering the legislature to create such exemptions.

To bolster their uniformity challenge, plaintiffs contended that there was no authority to suggest that homestead exemptions were exempt from the uniformity clause and noted that that clause itself provided that any exceptions to its uniformity requirement would be specified in that same section. With respect to their claim that the legislature enacted a cap or deduction *ultra vires*, plaintiffs argued that section 15-176's determination of the amount to be reduced from the

equalized assessed value by looking to the increase in value of a property precluded the section from providing a true "exemption." Regarding their equal protection claim, plaintiffs argued that the alternative exemption benefitted exclusively Cook County while discriminating against the remaining counties of the state. Plaintiffs particularly noted that, since the remaining counties assessed properties annually, whereas Cook County assessed properties triennially, and the alternative exemption only applied to annual increases in the values of homesteads in excess of 7%, the remaining counties could only receive a benefit if their homesteads experienced a 7% increase in any given year. Plaintiffs contended that the apparent unlikelihood of that event was demonstrated by the fact that no other county had opted into the new alternative homestead exemption. Finally, in support of their retroactivity claim, plaintiffs, while agreeing that the "harsh and oppressive standard" applied, argued that the applicable factors used to determine whether retroactive taxation was impermissibly "harsh and oppressive" mitigated in their favor. Plaintiffs contended that retroactive application of the alternative homestead exemption in section 15-176 was "harsh and oppressive" because the intent of that section was discriminatory in that it sought to provide selective tax relief to some taxpayers while shifting the burden to others; because the period the section would retroactively cover was significant; because taxpayers received inadequate notice of this retroactive application; and, finally, because taxpayers reasonably and detrimentally relied on the prior homestead exemption scheme.

The circuit court entered its written ruling on defendants' and the Department's motions to dismiss on April 22, 2005. The circuit court rejected each of plaintiffs' contentions, and on motion of the defendants, dismissed plaintiffs' complaint in its entirety. Plaintiffs now appeal.

1-05-1488

## ANALYSIS

Plaintiffs' challenges to section 15-176 are all constitutional in nature. In that regard, our General Assembly's enactments are presumed to be constitutional. See People v. Wilson, 214 Ill. 2d 394, 398-99, 827 N.E.2d 416, 419-20 (2005) ("All statutes are presumed to be constitutional, and the burden of rebutting that presumption is on the party challenging the validity of the statute to demonstrate clearly a constitutional violation"); South 51 Development Corp. v. Vega, 335 Ill. App. 3d 542, 549-50, 781 N.E.2d 528, 535 (2002) ("Statutes are presumed constitutional [citation] ***. [Citations.] A party challenging a statute's validity bears a heavy burden of clearly establishing that the subject legislation is unconstitutional"). Moreover, courts will construe statutes, if possible, to be constitutional. Wilson, 214 Ill. 2d at 398-99, 827 N.E.2d at 419-20; McKenzie v. Johnson, 98 Ill. 2d 87, 103, 456 N.E.2d 73, 81 (1983), quoting Illinois Crime Investigating Comm'n v. Buccieri, 36 Ill. 2d 556, 561, 224 N.E.2d 236, 239 (1967) (" 'if their construction is doubtful, the doubt will be resolved in favor of the validity of the law attacked' "); South 51 Development Corp., 335 Ill. App. 3d at 549-50, 781 N.E.2d at 535 ("we have a duty to sustain legislation whenever reasonably possible"). In reviewing the constitutionality of a statute, "no power is vested in us to inquire into or pass upon the wisdom or the desirability of the public policy which the statute proclaims. *** Our inquiry is [only] whether the legislation assailed squares with constitutional guaranties and, conversely, whether it violates constitutional prohibitions." People ex rel. Bernat v. Bicek, 405 Ill. 510, 516-17, 91 N.E.2d 588, 591 (1950). See also Peabody v. Russel, 301 Ill. 439, 442, 134 N.E.2d 148 (1922) ("The constitution of this State is a limitation upon the power of the legislature. Where the constitutional provisions are not

applicable no limitation exists upon the legislative body"). We particularly perceive the above principles to be important in our assessment of the constitutionality of revenue acts in light of the fact that it "was *** clearly a concern of [the drafters of the Revenue Article in our state constitution] that through court construction 'narrow' and 'unintended' limits might be placed upon the General Assembly's power." Hoffmann v. Clark, 69 Ill. 2d 402, 423, 372 N.E.2d 74, 84 (1977).

## I. Preliminary Procedural Matters

As a preliminary matter, we first address defendants' and the Department's motions to dismiss the instant appeal, raised in their briefs, for multiple failures by plaintiffs' three law firms to comply with the supreme court rules addressing the required contents of an appellant's brief, in spite of their tardy filing of their opening brief *instanter* and their later submission of what they designated as a corrected brief. Defendants point out that: plaintiffs never address the standard of review to be applied in their brief; plaintiffs provide a points and authorities section that does not specifically enumerate on which pages of the brief the various points and authorities may be found; plaintiffs' statement of facts does not appropriately cite to the record and is largely argumentative; and, finally, plaintiffs' appendix to their brief does not contain a table of contents or a copy of the order appealed from. See 188 Ill. 2d R. 341(e)(1), (e)(3), (e)(4)(ii), (e)(6); see also 210 Ill. 2d R. 342(a). We would tend to agree with defendants' assessment of plaintiffs' compliance with our supreme court rules. Additionally, we note that, in spite of the record indicating that a hearing was held on the motion to dismiss, plaintiffs have failed to include a transcript of that hearing, a stipulated statement of facts addressing the events at the hearing, or a

bystander's report, though we can only assume that a record of such a hearing would have proved helpful in our review. See Anthony v. Gilbrath, 396 Ill. 125, 128, 71 N.E.2d 84, 85-86 (1947) ("In view of this recital in the order allowing attorney's fees to appellant for services rendered on the 'hearing,' it cannot be assumed that there was no such hearing. From this order it definitely appears that there was a hearing of some kind. The record itself cannot be disputed or disregarded. If there was such a hearing, and from the order we must conclusively presume there was, then the burden was on appellant to show what transpired in the hearing by preserving a report of proceedings and making it a part of the record on appeal"); LaPlaca v. Gilbert & Wolf, Inc., 37 Ill. App. 3d 259, 260-61, 345 N.E.2d 774, 775 (1976) (holding that appellants have a duty to "present a record *** which fairly and fully presents all matters necessary and material for a decision of the question raised"). In light of these multiple instances of noncompliance by plaintiffs with the rules of appellate procedure, we would be inclined to agree that dismissal would not be an inappropriate consideration. See Epstein v. Galuska, 362 Ill. App. 3d 36, 42, 839 N.E.2d 532, 537 (2005) ("Where an appellant's brief fails to comply with supreme court rules, this court has the inherent authority to dismiss the appeal"). However, since the issues raised are of significant public interest, the record, though incomplete, appears sufficient to allow us to evaluate plaintiffs' claims, and the manifest efforts of the parties otherwise demonstrate serious thought and treatment; we will consider the issues raised on their merits.


## II.  Nondelegation Doctrine Separation of Powers

Plaintiffs' first specific contention on appeal is that the legislature, through section 15-176,

improperly delegated a power granted exclusively to it by the Illinois Constitution, namely, the power to grant homestead exemptions to the counties in violation of the principle of the separation of powers. Their first and primary attempt at doing so is by claiming that any delegation by the General Assembly of any amount of authority surrounding homestead exemptions would be a delegation in derogation of the separation of powers clause because the Illinois Constitution exclusively vests the authority to grant such exemptions in the General Assembly. Ill Const. 1970, art. IX, §6 ("The General Assembly by law may grant homestead exemptions or rent credits"). Plaintiffs next claim that our approval of this legislative delegation would open a Pandora's box and encourage the legislature to enact measures that would allow local governmental units to engage in unconstitutional activity such as invidiously discriminating against their citizens. Finally, plaintiffs argue that any legitimate delegation of authority to a local governmental unit does not allow that governmental unit to take actions that have effects beyond its boundaries, which, plaintiffs contend, the present delegation allows. We, however, disagree with plaintiffs' contentions.

Plaintiffs urge that section 15-176 improperly delegates to the counties a power exclusively vested in the legislature. Plaintiffs contend as they did in the circuit court that the power to exempt is nondelegable. They rely on the language of article IX, section 6 : "The General Assembly by law may grant homestead exemptions or rent credits." Ill Const. 1970, art. IX, §6. They contend that "by law" refers to statutes and the term "grant" limits the power to exempt only to the immediate and direct initiatives of the legislature and not to any enactments or initiatives of its political subdivisions or delegees. They contend that this interpretation is

consistent with an overall intent by the constitutional convention to have a unitary standard property tax system undifferentiated among the various counties. We disagree at several levels.

As a matter of general principle, the constitutional rule is that power granted to the legislature cannot be delegated. See Bicek, 405 Ill. at 517, 91 N.E.2d at 592. Thus, the " '[l]egislature must decide what the law shall be, and the power delegated to that department by the constitution cannot be again delegated to any other body or authority.' " See Bicek, 405 Ill. at 517, 91 N.E.2d at 592, quoting People ex rel. Breckon v. Board of Election Commissioners, 221 Ill. 9, 19, 77 N.E. 321, (1906). However, as part of its legislative power, the General Assembly may delegate the administration of its laws to other bodies and may even grant limited discretion to those bodies in implementing the General Assembly's legislation. See Reif v. Barrett, 355 Ill. 104, 132-33, 188 N.E. 889 (1933) ("Legislative power is authority to pass rules of law for the government and regulation of people or property. Where the legislative body has the power to enact a law as a necessary adjunct to such power it has the legal right to adopt a procedure for the administration of such law. It may do this through commissions, or through boards, and it may grant to such administrative bodies certain authority and certain powers in keeping with the spirit of the act for the practical application and operation of the law. It may even invest them with certain discretion to be exercised by them in the discharge of their functions as ministerial or administrative agencies. Such exercise of discretion may be found in laws governing the assessment of taxes, the Industrial Commission, and different examining boards passing upon applications of those desiring to practice professions. It is impractical for legislative acts providing for the health, welfare, protection, and necessities of the people through boards or

commissions, to prescribe every detail of the duties to be performed by such boards or commissions. Such powers, when granted, are neither judicial nor legislative. *** The discretion granted is not a judicial or legislative discretion but a ministerial discretion falling within the doctrine of *ejusdem generis* as to powers conferred by the act"); accord Meadowlark Farms, Inc. v. Illinois Pollution Control Board, 17 Ill. App. 3d 851, 855, 308 N.E.2d 829, 832 (1974), citing Reif, 355 Ill. at 132-33, 188 N.E. 889; Bicek, 405 Ill. at 517, 91 N.E.2d at 592 ("Although the General Assembly cannot divest itself of its inherent function to decide what the law shall be, it may authorize others to do those things which it might properly but cannot understandingly or advantageously do itself").

Thus, delegation would only be improper should the General Assembly allow the body to which it delegates authority so much discretion that it may, in effect, make the law itself. See Bicek, 405 Ill. 2d at 517, 91 N.E.2d at 592 ("An act which vests any person with arbitrary discretion to determine what the laws shall be in a particular situation is invalid"); accord Rogers v. Desiderio, 274 Ill. App. 3d 446, 449, 655 N.E.2d 930, 932 (1995). The General Assembly may avoid this result by limiting the authority of the body to which the General Assembly delegates some of its own power through the provision of guidelines and standards for the body to follow. See East St. Louis Federation of Teachers, Local 1220, v. East St. Louis School District No. 189 Financial Oversight Panel, 178 Ill. 2d 399, 423, 687 N.E.2d 1050, 1063-64 (1997) ("Proper delegation of authority must provide sufficient standards to guide the administrative body in the exercise of its functions. [Citation.] However, '[a]bsolute criteria whereby every detail necessary in the enforcement of a law is anticipated need not be established

by the General Assembly. The constitution merely requires that intelligible standards be set to guide the agency charged with enforcement.' [Citation.]"); People ex rel. Chicago Dryer Co. v. City of Chicago, 413 Ill. 315, 321, 109 N.E.2d 201, 204 (1952) ("Overall, the fundamental distinction lies between a delegation of power to make the law, which involves a discretion of what the law shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done; the latter is unobjectionable"); South 51 Development Corp., 335 Ill. App. 3d at 550, 781 N.E.2d at 535 ("The law is well settled that the General Assembly may grant and administrative agency discretionary powers to decide an issue provided it establishes standards under which the agency's discretion may be exercised"). Under these considerations the delegation effected by section 15-176 is neither excessive nor otherwise improper.

The constitutional grant of power to the General Assembly to create homestead exemptions by law does not lead to the conclusion that the General Assembly may not delegate any of its authority on the subject. As demonstrated above, the General Assembly's authority to incrementally delegate its own authority in furtherance of its enacted legislation is part and parcel of its ability to pass any law on any given subject. See Reif, 355 Ill. at 132-33; Meadowlark Farms, 17 Ill. App. 3d at 855, 308 N.E.2d at 832. The body so empowered by the General Assembly does not exercise any power but that given to it by the legislature and essentially amounts to a tool in the hands of the legislature. Thus, even if the power to legislate on a subject is limited exclusively to the General Assembly, and, of course, in any event, as all concede, the power to legislate is generally restricted to that body, the General Assembly may still delegate its

implementation to other bodies. This conclusion is further borne out by prior judicial approval of limited delegations by the General Assembly of other powers that have been recognized as resting exclusively with the legislature. Compare Ill. Const. 1970, art. IX, §1 ("The General Assembly has the exclusive power to raise revenue by law except as limited or otherwise provided in this Constitution. The power of taxation shall not be surrendered, suspended, or contracted away"), with Painter v. Board of Trustees of the Town of Lyons, 161 Ill. App. 3d 26, 30, 513 N.E.2d 928, 930 (1987) ("The supreme court specifically found that this funding procedure did not violate the 1970 Constitution, noting that the General Assembly is constitutionally unrestricted in the manner it chooses to delegate the power to tax and in the manner it directs a local government to exercise that responsibility"); see also Forest Preserve District v. Brown Family Trust, 323 Ill. App. 3d 686, 691, 753 N.E.2d 1110, 1114 (2001), quoting Village of Hyde Park v. Oakwoods Cemetery Ass'n, 119 Ill. 141, 149, 7 N.E. 627 (1886) (" 'The necessity or propriety of exercising the right of eminent domain is a political question, -one which belongs exclusively with the legislature to determine.' [Citation.] However, the legislature may delegate the power of eminent domain to other governmental bodies").

Appellants contend that notwithstanding the limited delegation otherwise permissible under the general powers of the General Assembly, such delegation has been particularly circumscribed under the provisions of article IX, section 6, of the 1970 Constitution. Ill. Const. 1970, art. IX, §6. They contend that the use of the terms "by law may exempt" and "by law may grant" in that provision is intended to vest the power to exempt solely in the General Assembly and to restrict the power to delegate beyond any restrictions applicable to ordinary legislative

delegation. This contention is unsupported textually or otherwise. Appellants provide no underlying rationale to explain why, aside from purported arbitrary design, there should be greater concern with respect to the General Assembly's power to delegate its exemption authority beyond the latitude otherwise permissible in the delegation of its other legislative powers, under guidelines which have been held not to conflict with the general principle that the power invested in the legislature by the constitution is nondelegable. Bicek, 405 Ill. 2d at 517, 91 N.E.2d at 592; Chicago Dryer Co., 413 Ill. at 321, 109 N.E.2d at 204. We further note that arguably the use of the operative terms, "by law may grant" and "by law may exempt," is particularly appropriate to exemptions that instead of broadly providing for rights and duties focus upon singular entities and act to identify and cull certain properties for specific tax relief.

Moreover, the attribution to the language of section 6 of article IX of the 1970 Constitution, an intent to limit or proscribe legislative delegation with respect to exemptions beyond the guidelines that control such delegation in other legislative areas is inconsistent with the following comments of John Karns, the chairman of the Committee on Revenue and Finance Proposal Number 2 during the 1970 Constitutional Convention in support of the adoption of current exemption provided in article IX section 6. See Sixth Illinois Constitutional Convention, May 22, 1970 to July 9, 1970, at 2080 (June 25, 1970) (statements of Delegate Karns).

> "Mr. President, I was, I suppose, the principal proponent of the sentence that the General Assembly may grant homestead exemptions and rent credits, and I would like to speak against Delegate Garrison's amendment.
>
> I think in 1870 when our present constitution was adopted and did not

provide for a homestead exemption, it was not contemplated that the – the heavy burden of taxation on residential real estate. The language does not require or mandate any particular form of exemption but is a rather broad grant of power to the General Assembly to devise an equitable system of exemptions of rent credits.

I would point out to the Convention that when you limit the credit to the elderly needy, there are many, many people in our society today that are *not* elderly but *are* needy. I submit that the General Assembly might want to provide some relief to widows, regardless of age, with families.

This provision is a flexible one, and I think in a day and age where the burden of taxation is so great on residential real estate, it should be in the constitution granting this power to the General Assembly." Sixth Illinois Constitutional Convention, May 22, 1970, to July 9, 1970, at 2080 (June 25, 1970) (statements of Delegate Karns).

There would appear to be no reason why a provision so concerned with operational flexibility in addressing changing social concerns as reflected in Delegate Karns' statements would be entirely inflexible with respect to the General Assembly's ability to exercise its powers to delegate to those bodies most capable of achieving the intended legislative ends.

Moreover, even if credence were given to the contention that the constitution intended to impose more severe limitations on delegation involving exemptions than delegations of other legislative power, that limitation would not be inconsistent with the granting of a local option, since the local option does not delegate any discretion in structuring or formulating the operative

rule of law which is wholly crafted by the legislature. It is not a delegation of the type involved in the delegation of a right to draft specific rules and regulations to implement a general policy formulated by the legislature. There is no designation of any legislative rule-making authority, *i.e.*, authority to formulate and draft a rule, but only a "take it or leave it option" of a fully drafted and fully formulated piece of legislation.

This kind of delegation has repeatedly been approved of and found not to violate the non-delegation doctrine or separation of powers. See Hoogasian v. Regional Transportation Authority, 58 Ill. 2d 117, 128-29, 317 N.E.2d 534, 540-41 (1974). There our supreme court declared:

> "Plaintiffs next argue that the Act improperly delegates legislative authority by permitting the voters to determine whether or not the RTA should be created. In this regard, emphasis is placed on the language of the Act which refers to electors approving 'creation' of the Authority which is to be 'established' only upon a favorable vote.
>
> Although the power to make laws is vested in the legislature, which may not delegate that power to other bodies, authorities or persons (People ex rel. Chicago Dryer Co. v. City of Chicago, [413 Ill. 315, 109 N.E.2d 201 (1952)]; Sheldon v. Hoyne, [261 Ill. 222, 103 N.E.2d 1021 (1913)]; Rouse v. Thompson, [228 Ill. 522, 81 N.E. 1109 (1907)]), it has long been recognized that the legislature may properly enact a complete law which is to become operative upon the happening of a specified contingency such as the affirmative vote of the people

in the area or district to be affected. (People v. Chicago Transit Authority, 392 Ill. 77, 64 N.E.2d 4 (1945); People v. Kelly, [357 Ill. 408, 192 N.E.2d 372 (1934)]; People ex rel. Thomson v. Barnett, [344 Ill. 62, 176 N.E. 108 (1931)]; People v. McBride, [234 Ill. 146, 84 N.E. 865 (1908)]; Home Insurance Co. V. Swigert, [104 Ill. 653 (1882)]; Erlinger v. Boneau, [51 Ill. 94 (1869)]; People ex rel. Wilson v. Salomon, [51 Ill. 37 (1969)]). The above-cited authorities support the conclusion that the RTA Act did not improperly delegate legislative powers to the voters. When the Act became effective on December 12, 1973, all of its terms were fixed and complete with nothing being left to the voters to decide as to the substance of the Act. The one contingency which the legislature determined must be met prior to the time the Authority was to be established and become operative was a favorable vote of the electors in the six northeastern counties to be served by the proposed authority." Hoogasian, 58 Ill. 2d at 128-29, 317 N.E.2d at 540-41.

Accord Chicago Dryer Co., 413 Ill. at 320, 109 N.E.2d at 204 ("it is also recognized that the ultimate operation of law may by its own terms be made to depend upon a contingency, such as an affirmative vote of the electors in a given district or upon the action of some municipality, commission, or other public agency named in the act"); Rogers, 274 Ill. App. 3d at 449, 655 N.E.2d at 932 ("The supreme court has determined that the legislature does not impermissibly delegate lawmaking power when it grants to voters the privilege of organizing school districts under statutes which specify with particularity the rules and conditions under which the

organization may be made"); Malito v. Marcin, 14 Ill. App. 3d 658, 660, 303 N.E.2d 262, 265 (1973) (stating, where local voters voted to preclude the sale of alcohol in their precinct, as they were permitted to do under the Liquor Control Act enacted by the General Assembly, "The voters were not asked to decide what the law should be within the precinct, but whether a law already enacted by the legislature should become operative within that precinct. The voters possessed no discretion to do anything beyond that"); see also Reece v. Board of Education of the City of Chicago, 328 Ill. App. 3d 773, 783-84, 767 N.E.2d 395, 404 (2002) (General Assembly may delegate authority to local school boards to waive certain statewide statutory school board mandates).

Additionally, the local option available under section 15-176 does not permit rejections of any homestead exemption, but only permits a narrow window of choice between the existing homestead exemption fully fleshed out by the General Assembly under section 15-175 and the fully fleshed-out alternative exemption under section 15-176. Thus the local option embodied in section 15-176 gives full reflection of the design and intent of the legislature with regard to the exercise of its constitutional authority to provide homestead exemptions.

In effect each county is asked to determine whether the economic needs of its homeowners and their corresponding impact on neighborhood stability to which the alternative exemption under section 15-176 is targeted are confronted in their local communities so as to warrant its adoption. The alternative would be to burden the legislature to survey and conduct studies on its own in order to determine the local conditions of each of 102 counties within the state of Illinois and surmise which and whether any of such counties require the relief which

section 15-176 is designed to provide.   In that sense each county is a tool of the legislature to implement policies and laws that the legislature has devised and approved of.  The counties have no discretion to engage in any lawmaking of their own beyond their empowerment to select between two legislatively crafted and developed alternatives.

Also we cannot be driven by plaintiffs' arguments surrounding possible further delegations by the General Assembly, beyond the alternative homestead exemption at issue, were we not to hold that section 6 of article IX (Ill. Const. 1970, art. IX, §6) precluded any delegation of authority by the legislature.  The plaintiffs hypothesize scenarios in which so many different alternative homestead exemptions would be allowed that a wholly nonuniform, completely unworkable system of taxation would come into being, or where the legislature would delegate its power to exempt properties used for religious purposes and local entities would invoke that authority to discriminate against unfavored groups.  As stated by our supreme court in Hoffmann v. Clark, 69 Ill. 2d 402, 424, 372 N.E.2d 74, 84-85 (1977):

> "We cannot read into the Constitution a limitation which it does not contain solely to prevent some possible future abuse.  Whether the principle of classification may at some time in the future be unwisely applied is not of judicial concern.  The formation of tax policy although it may be foolish and unwise, so long as it remains within constitutional limits, is peculiarly within the province of the elected representatives of the People."

We generally find that such speculative projections and concerns exist more in the universe of advocacy rather than in actuality.  We have no reason to question at this time that the

-29-

legislature will act responsibly and can well cope with any such legislative excess if and when it may arise.

Likewise, in considering whether the grant of a local option constituted an undue delegation simply because it may have extraterritorial impact, insofar as it extends to a local taxing district which may intersect and overlap with collar counties which did not adopt the alternative exemption, we cannot rule that a county's selection of the alternative homestead exemption may impermissibly have extraterritorial effect in the form of resulting different tax rates in other counties. Plaintiffs contend that valid delegations of discretion by the legislature to smaller governmental units only allow those units to address purely local questions with corresponding exclusive local effect. But, we find this contention belied by the case in Hoogasian, 58 Ill. 2d at 134-35, 317 N.E.2d at 543-44. In that case, after addressing a number of delegation challenges to the Regional Transportation Authority Act which, among other things, permitted the RTA to levy taxes and issue bonds, the court considered its plaintiffs' allegation that the authority granted to the RTA would undercut other municipalities' attempts at providing public transportation as well as other existing public transportation districts. Hoogasian, 58 Ill. 2d at 134, 317 N.E.2d at 543. The Hoogasian plaintiff contended that by this delegation of authority to the RTA, the General Assembly actually was impermissibly *de facto* amending the Greater Lake County Mass Transit Act, which authorized the creation of the other local transportation districts, without expressly amending the statute as constitutionally mandated. Hoogasian, 58 Ill. 2d at 134, 317 N.E.2d at 543. In responding to this argument, our supreme court stated:

"It may well be that the establishment of the RTA will ultimately have an effect on the programs, plans and policies of units of local government such as the Greater Lake County Mass Transit District. However, we are unable to concur with plaintiffs that this is constitutionally objectionable." Hoogasian, 58 Ill. 2d at 135, 317 N.E.2d at 544.

### III. Uniformity

Section 4(a) of article IX provides that, "Except as otherwise provided in this Section, taxes upon real property shall be levied uniformly by valuation ascertained as the General Assembly shall provide by law." Ill. Const. 1970, art. IX, §4(a). This clause is intended to prevent different tax treatment among similar classes of property within a taxing district. See Kankakee County Board of Review v. Property Tax Appeal Board, 131 Ill. 2d 1, 20-21, 544 N.E. 2d 762, 771 (1989) ("The principle of uniformity of taxation requires equality in the burden of taxation. [Citation.] This court has held that an equal tax burden cannot exist without uniformity in both the basis of assessment and in the rate of taxation. [Citation.] The uniformity requirement prohibits taxing officials from valuating one kind of property within a taxing district at a certain proportion of its true value while valuating the same kind of property in the same district at a substantially lesser or greater proportion of its true value. [Citations.]"); Rodgers v. Whitley, 282 Ill. App. 3d 741, 751, 668 N.E.2d 1023, 1031 (1996) ("a claim that a statute is unconstitutional under the uniformity of taxation clause must allege a disparate valuation or rate of taxation for similar properties within individual taxing districts"); People ex rel. Hawthorne v. Bartlow, 111 Ill. App. 3d 513, 520, 444 N.E.2d 282, 287 (1983) ("The rule of uniformity which has developed

from article IX, section 4(a), requires that one person shall not be burdened with a greater proportion of the taxes, according to the value of his property, than another. It does not permit valuation by taxing officials of property in the same taxing district at a certain proportion of its true value while other property in that district is valued at a substantially lesser or greater proportion").

Plaintiffs recognize that exemptions by their very nature cannot be assessed in uniformity with similar properties. They acknowledge that the very designation of an exemption disassociates properties subject to the exemption for assessment and taxation purposes from properties that would otherwise be similar but for the characteristics that they bear to invoke the exemption. They, nevertheless, contend that they are still subject to the uniformity provisions of section 4(b) applicable to the uniformity to which the classification of property is made subject, namely that there must be uniformity within the class of homestead properties. See Ill. Const. 1970, art. IX, §4(b). They contend that section 4(a) (Ill. Const. 1970, art. IX, §4(a)) extends to the homestead exemption clause under section 6 (Ill. Const. 1970, art. IX, §6) to the extent that "this or any homestead exemption must be uniform within the class of homestead property *** that is the class on which the exemption operates." On this supposition, they argue that section 15-176 of the Code violates the requirement of uniform taxation within the "class" of similar homestead property in the following ways: first, the alternative exemption is nonuniform geographically in that not all counties are covered, nor is treatment uniform for homestead owners in a taxing district overlapping between Cook County and the collar counties; second, the alternative exemption is nonuniform as between new owners of property and established owners

of property or owners who have received property through an intrafamily transfer; third, plaintiffs contend the alternative exemption is nonuniform in that younger persons and senior citizens who do not qualify for the senior freeze exemptions receive a larger benefit over those citizens who qualify for the senior freeze exemption (35 ILCS 200/15-172 (West 2004)). They further point to the disparity resulting from the staggered effect of the quadrannual assessment to which the alternative exemption looks in determining the base price.

As shall be discussed below, plaintiffs' contentions fail on two grounds: first, the assumption that exemptions still remain subject to the strictures of uniformity under section 4(a) is not well-founded; second, even if homestead exemptions were still subject to uniformity requirements of section 4(a), those requirements are not absolute and would flex to accommodate the disunity inherent in the constitutional grant of the power to exempt.

Plaintiffs contend that any exception to the uniformity strictures of section 4(a) must be contained or set forth within that specific section pursuant to its specific provision that states that uniformity is required in taxation "[e]xcept as otherwise provided in this section." Ill. Const. 1970, art. IX, §4(a). Plaintiffs assert that since power to exempt homesteads is provided in a different section, namely, section 6 of article IX (Ill. Const. 1970, art. IX, §6), rather than section 4(a) (Ill. Const. 1970, art. IX, §4(a)), uniformity is required. We disagree. Plaintiffs do not support that argument with any citation to authority and more overridingly ignore the basic purport of the term "exemption," which denotes an intent to except and exclude. To exempt property, in its statutory context, means to except it from the general strictures of the assessment process, which would include the strictures of uniformity as well. As shall be demonstrated, to

harness exemptions to uniformity requirements of section 4(a) would undermine and defeat the basic policy, purpose, and function of section 6 as articulated on the convention floor and by our supreme court, which is primarily to provide tax relief where needed to protect homeowners from displacement resulting from the rapid appreciation of market property values and the corresponding increase in property taxes.  See McKenzie, 98 Ill. 2d at 107, 456 N.E.2d at 83 ("At the very least article IX, section 6, authorizes the legislature to grant exemptions to specific classes of needy homeowners who are 'threatened with the loss of their residence through high property taxes.' [Citation.]"); Proviso Township High School District No. 209 v. Hynes, 84 Ill. 2d 229, 240, 417 N.E.2d 1290, 1295 (1980) ("the committee's concern was not with persons or entities who owned residential property solely as an investment, but with owner-occupants who were threatened with the loss of their residence through high property taxes"); Doran v. Cullerton, 51 Ill. 2d 553, 559, 283 N.E.2d 865, 867 (1972) (upholding a homestead exemption applicable to seniors after the effective date of the 1970 Constitution and stating: "In these times of increasing real estate taxation and rising prices, the benefits conferred by many retirement plans may not provide adequate income").  Toward this end, the drafters of our state constitution attempted to impart for passage by the people a " 'flexible' " provision delivering a " 'broad grant of [authority] to the General Assembly.' "  McKenzie, 98 Ill. 2d at 107, 456 N.E.2d at 83, quoting 3 Proceedings of the Sixth Constitutional Convention 2080-81 (statements of Delegate Karns).

In fact, in its explanation of the provision to the voters prior to the referendum on the 1970 constitution, the convention asserted that the homestead exemption provision " 'permits tax

1-05-1488

relief or tax credit to people who own or rent their homes.  Such relief may be limited to the elderly or needy, or, at the discretion of the General Assembly, may be granted to everyone.' [Citation]."  (Emphasis omitted.)  Proviso Township, 84 Ill. 2d at 240, 417 N.E.2d at 1295; see also McKenzie, 98 Ill. 2d at 108, 456 N.E.2d at 83 ("it was the intention of the delegates by adopting article IX, section 6, to grant the legislature broad powers to fashion homestead exemptions that would promote other legitimate social policies as well, such as rewarding the patriotic service of veterans 'who have been obliged to drop their own affairs to take up the burdens of the nation.' [Citation.]"); Doran, 51 Ill. 2d at 559, 283 N.E.2d at 867.  This mandate requires broad latitude to meaningfully pinpoint and target the exemption to provide relief to properties most suitable to accomplish the social, economic and humane purposes for which the power to exempt was designed.

This result would by no means permit exemptions to be extended arbitrarily or discriminatorily without constitutional scrutiny or control.  Although not subject to the uniformity requirements of section 4(a), such exemptions would nevertheless remain subject to the uniformity imposed under the equal protection doctrine.  See U.S. Const., amend XIV; Ill. Const. 1970, art. I, §2.  However, as shall be more fully discussed below, to hamstring the grant of such exemptions by tying them to the relatively rigid requirements of uniformity under section 4(a), as opposed to the more flexible rational basis standard under the equal protection clause, would contravene the policy and purpose of the exemption clause in facilitating tax relief where a special need arises.

The rationale for this conclusion is reflected in some of the very disparities which

plaintiffs use to demonstrate the would-be breach of the uniformity requirement of section 4(a). As noted, plaintiffs contend that the alternative exemption creates disparities between new resident owners and old resident owners; between intrafamily purchases and arm's-length purchases outside the family; and between senior citizens who are eligible for the senior freeze under section 15-172 of the Code (35 ILCS 200/15-172 (West 2004)) and those who are not.

In each of these instances it is apparent that the nonuniformity is mandated by the expressed policy and purpose of the homestead exemption to provide tax relief where most needed for the public good, without necessitating that the exemption be available to properties where the need for its remedial effect is either absent or less acute. As articulated by the United States Supreme Court in Nordlinger v. Hahn, 505 U.S. 1, 12, 120 L. Ed. 2d 1, 14, 112 S. Ct. 2326, 2333 (1992), the provision of the homestead exemption is designed to avert the displacement of lower income families by "forces of gentrification."

This was the very basis upon which the distinction was made in Proviso Township, 84 Ill. 2d at 240, 417 N.E.2d at 1295, between residential property owned solely as an investment but not owner-occupied and homestead property which was owner-occupied, in order to protect against ultimate dispossession by occupants in an appreciating market who could not be able to keep up with the increasing tax burden. Just as in Proviso, the availability of the homestead exemption is not challengeable on the grounds that it was nonuniform with nonhomestead property. See Proviso Township, 84 Ill. 2d at 240, 417 N.E.2d at 1295. So too, even where the property is owner-occupied and therefore meets the broad definition of homestead, the uniformity clause should not be available to prevent further delineations based upon the extent of need and

thus defeat the overall policy upon which the constitutional drafters premised the availability of the exemption in the first instance.

Demonstrably, the homestead exemption is more appropriate for less recent ownership than for new ownership since it is designed to ameliorate the economic pitfalls experienced by older residents who initially purchased property at a price commensurate to their income but who because of rapid escalation in price, find that the property appreciated far in excess of their income level and their ability to pay the increased taxes. To that extent, as articulated in Nordlinger, the State can "legitimately *** conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing [one]." Nordlinger, 505 U.S. at 12, 120 L. Ed.2d at 14, 112 S. Ct. at 2333. It is the old owner who may have purchased the property which was priced at a price commensurate with his income who is going to be displaced by the appreciation of the property where his income level is left in the dust.

Likewise, there is far less need to extend the homestead exemption to instances where property is acquired by a stranger rather than through intrafamily transfers between spouses or parents and children, which simply involves the shifting of funds within a single close family unit, often in the context of children helping to finance the acquisition of proper care for aging parents through a transfer of title to the family home.

Similarly, plaintiffs' contention that the alternative exemption violates section 4(a) insofar as it does not apply to senior citizens eligible for the senior freeze exemption under section 15-172 of the Code (35 ILCS 200/15-172 (West 2004)) completely ignores the basic purpose and

1-05-1488

policy underlying the grant of homestead exemptions as envisioned by the drafters of the constitution, which as recited in <u>McKenzie</u> authorizes the legislature to grant exemptions to specific classes of needy homeowners threatened with loss of homes by high property taxation. <u>McKenzie</u>, 98 Ill. 2d at 82-83, 456 N.E.2d at 105-06. Obviously, for those who are eligible for a senior freeze exemption under section 15-172 (35 ILCS 200/15-172 (West 2004)), there is less need for the enhancement of the alternative exemption and there would be no need to allow them to stack these exemptions.

To apply the strictures of section 4(a) uniformity as urged by the plaintiffs would demonstrably obstruct, if not totally preclude, the extension of any homestead exemptions. Such relief by exemption depletes the tax base and therefore must be measured out carefully so as not to unnecessarily shift the burden to other taxpayers by depletions that are not otherwise warranted. Exemptions therefore cannot by their very nature be extended to all properties bearing such similar general assessment characteristics without reflecting the requisite degree of economic need and social benefit that the exemptions are designed to subserve. If anything, plaintiffs would postulate that the requirements of uniformity under section 4(a) would not permit reasonable delineations between greater and lesser economic and social needs, which are the predicates established for the extension of exemptions in the first place. Plaintiffs would require that if basic assessment characteristics are similar, exemptions be extended on an all-or-nothing basis, as would be the case under their interpretation of the uniformity requirements under the classification provision of section 4(b).

The conclusion, which would recognize a constitutional intent to alleviate exemptions

-38-

from the hobbles of section 4(a) uniformity, is, as already pointed above, fully consistent with the pronouncements of McKenzie, Doran, and Proviso Township, and is even more explicitly supported by the decision of our supreme court in Grais v. City of Chicago, 151 Ill. 2d 197, 601 N.E.2d 745 (1992). In Grais, the city of Chicago passed an ordinance creating a special service area/taxing district to pay for improvements in public transportation in the central area of the city. Grais, 151 Ill. 2d at 203-04, 601 N.E.2d at 748-49. The Grais plaintiff filed suit contending, among other things, that the creation of the special service area created nonuniformity in taxation. Grais, 151 Ill. 2d at 208, 601 N.E.2d at 751. Our supreme court rejected this challenge, however. Grais, 151 Ill. 2d at 208, 601 N.E.2d at 751. The Grais court observed that the local special service area power established in another article of the constitution was an intended departure from the requirements of the uniformity clause and specifically rejected its plaintiff's claim that the uniformity clause must predominate over the special service area clause. Grais, 151 Ill. 2d at 208, 601 N.E.2d at 751. The court further noted, "[i]ndeed, if complete uniformity of property taxes were required, it would be impossible for local governments to create special service areas." Grais, 151 Ill. 2d at 208, 601 N.E.2d at 751. Plaintiffs here, however, argue that Grais has no instant application on the grounds that the special service area power is in another article of the constitution, whereas the homestead exemption power is in the same article as the uniformity clause. We are unpersuaded by this argument, however. What we find most significant is that, like the special service area power in Grais, the homestead exemption clause is a freestanding grant of legislative authority, irrespective of wherever it may have been placed within the constitution. Moreover, we discern that if the uniformity clause were as universal and ironclad as

plaintiffs claim, then our supreme court would have to have decided <u>Grais</u> differently.

From another perspective, even if we were to accept the premise that homestead exemptions are not completely free from the strictures of section 4(a), plaintiffs would be compelled to concede, as noted above, that the uniformity requirements of section 4(a) even from their perspective would have to yield to the fact that exemptions by their very nature entail a measure of nonuniformity with properties that do not qualify as homesteads although they are otherwise similar in every other respect. See <u>Proviso Township,</u> 84 Ill. 2d at 240, 417 N.E.2d at 1295.

Although the requirements of section 4(a) uniformity are not as malleable and appropriate to implement the purpose of section 6, as they would be if determined exclusively under equal protection analysis, those requirements under section 4(a) would nevertheless be sufficiently flexible to accommodate to the provisions of the alternative tax exemption under section 15-176 of the Code. Our supreme court has long held that uniformity need not always be pure, absolute, or fully consistent. See <u>Apex Motor Fuel Co. v. Barrett</u>, 20 Ill. 2d 395, 401-02, 169 N.E.2d 769, 773 (1960) (all that is required is a reasonable degree of uniformity). As stated in <u>Peacock v. Property Tax Appeal Board</u>, 339 Ill. App. 3d 1060, 1069-70, 792 N.E.2d 367, 374 (2003), quoting <u>Schreiber v. County of Cook</u>, 388 Ill. 297, 303, 58 N.E.2d 40, 43 (1944):

> " 'Perfect equality and uniformity of taxation as regards individuals or
> corporations or different classes of property subject to taxation can hardly be
> visualized. Absolute equality is impractical in taxation and is not required by the
> equal protection clause of the constitution. Inequalities that result occasionally

and incidentally in the application of a system that is not arbitrary in its classification, and not applied in a hostile and discriminatory manner, are not sufficient to defeat the tax.' "

See also In re Application of the County Treasurer & Ex-Officio County Collector of Cook County, 175 Ill. App. 3d 564, 573, 529 N.E.2d 1104, 1109 (1988) ("The constitutional requirement of uniformity is met where: (1) the intent of the statute is to adjust the burden with a reasonable degree of uniformity; and (2) the effect of the statute in its general operation is that it adjusts the burden with a reasonable degree of uniformity").

The record of the constitutional convention makes clear that the drafters of the uniformity clause did not intend for that clause to hamstring the General Assembly in addressing changing social problems. See Hoffmann, 69 Ill. 2d at 421, 372 N.E.2d at 83 ("the Committee on Revenue and Finance recognized that the constitution which was being written should not prohibit the use of this means [classification of real property] to cope with future problems which may be brought about by changing conditions. The committee stated in its report to the convention: 'Finally, the complexity of urban life and the rapid changes that occur in our society mean that a uniform property tax may have undesirable economic and social effects. For example, the property tax may discourage the maintenance of property. It often encourages the use of land in ways that are not in the best interest of society--creating urban sprawl and the development of urban and rural slums.' [Citation.]"). Further, the convention recognized that, in addressing such future problems, some nonuniformity could arise. See Hoffmann, 69 Ill. 2d at 421-22, 372 N.E.2d at 83 ("Also, along the same line, the committee stated further: 'The Committee feels that it would be

1-05-1488

undesirable to permit 102 different systems of real estate taxation in the state.  Nevertheless, the

Committee does not believe that it is desirable to prevent any possible future use of classification.'

[Citation.]").

Therefore, even if section 6 were not entirely independent of the requirements of section

4(a) uniformity, the result would be the same with respect to the disparities engendered by the

senior freeze and by the differentiations between intrafamily transfers and arm's-length transfers

and between new purchasers and preexisting ones.  Manifestly, even if section 4(a) would

otherwise control, it would have to be interpreted to provide sufficient latitude for exemptions to

target areas of greater need and public benefit without being burdened and shackled under section

4(a) to unnecessarily deplete the tax base by extending itself to a substantially broader range of

properties, not otherwise deserving, or as deserving, of such tax breaks.  See McKenzie, 98 Ill. 2d

at 82-3, 456 N.E.2d at105-06; Apex Motor Fuel Co., 20 Ill. 2d at 401-02, 169 N.E.2d at 773;

Proviso Township, 84 Ill. 2d at 240, 417 N.E.2d at 1295; Peacock, 339 Ill. App. 3d at 1069-70,

792 N.E.2d at 374.

With respect to plaintiffs' claim that section 15-176 creates an impermissible non-

uniformity in taxation throughout Illinois in that not all counties adopted section 15-176, as

defendants point out, our constitution only requires uniformity among properties within the same

taxing district.  Such disparity between counties is inherent under section 4(b), which permits

classification on a county-by-county basis and should also therefore apply to homestead

exemptions once we accept, as we do, the constitutionality of the local option which section 15-

176 provides.  Thus uniformity, if required, would be intracounty, rather than intercounty.  Du

-42-

Page County Board of Review v. Property Tax Appeal Board, 284 Ill. App. 3d 649, 653, 672 N.E.2d 1309,1312 (1996), citing Kankakee County Board of Review v. Property Tax Appeal Board, 131 Ill. 2d 1, 21, 544 N.E.2d 762, 771 (1989) ("the supreme court noted that the uniform assessment requirement mandates that property not be assessed at a substantially greater proportion of its value when compared to similar properties located *within the taxing district.* [Citation.]" (Emphasis in original.).

Moreover, argument can be made that the disparity between counties is not one which is germinated by the General Assembly since the option is made equally available to everyone. Whether to opt in or out of the ordinance is presumptively determined by each county's evaluation of the need for an extended homestead exemption based upon the economic and social circumstances within its boundaries, which differ from county to county. Counties with lesser degree of appreciation in property values or with correspondingly greater economic equilibrium between income levels of occupants and increasing values of the property, or with a smaller overall tax bite as reflected in their rates and levies, or with whatever other variables may rationally determine the need for exemptions, will refuse to opt in. That decision should not preclude homeowners within counties such as Cook, where the need for enhanced exemptions is manifest and obvious, from opting in.

In that same regard, plaintiffs' argument that the alternative exemption injects nonuniformity in a taxing district if it happens to overlap with property in a collar county which chooses not to adopt the alternative exemption must also fail. This potential for disparity is inherent as well under section 4(b) classifications since each county may decide whether to

classify and where Cook County has thus far been the only one to classify. Once the local option

under section 15-176 is found to be a constitutional delegation, as we have found, there is no

reason to distinguish more between disparities resulting from that delegation than there is for the

disparities inherently resulting under the local option provided in section 4(b) with respect to

classification. Moreover, as already stated, the local option under section 15-176 recognizes that

each county may have a legitimate basis upon which to either accept or reject the local option. If

anything, that potential would constitute a relatively minor imperfection within the reasonable

limitations of practical uniformity as set forth in Crozer v. People ex rel. v. Hanberg, 206 Ill. 464,

69 N.E. 489 (1903), and the recognition that such imperfections may result in isometrically

balancing the requirements of uniformity against the policy and purpose of exemptions,

classifications, and other accommodations made under the constitution . See In re Application of

the County Treasurer, 175 Ill. App. 3d at 573, 529 N.E.2d at 1109 ("The constitutional

requirement of uniformity is met where: (1) the intent of the statute is to adjust the burden with a

reasonable degree of uniformity; and (2) the effect of the statute in its general operation is that it

adjusts the burden with a reasonable degree of uniformity").

Likewise, the disparity resulting in valuation from the quadrannual system of staggered

assessments in Cook County has been tested and found to be within permissible latitude in Apex

Motor Fuel Co., 20 Ill. 2d at 401, 169 N.E.2d at 773. There our supreme court stated:

> "Uniformity in taxation, as required by the constitution, implies equality in
>
> the burden of taxation, and this equality in burden cannot exist without uniformity
>
> in the basis of assessment as well as in the rate of taxation. (Bistor v.

McDonough, 348 Ill. 624[, 181 N.E.2d 417 (1932)].)  The rule of uniformity requires an equality of taxation in proportion to the value of the property taxed.  It prohibits the taxation of one kind of property within the taxing district at one value while the same kind of property in the same district for taxation purposes is valued at either a grossly less value or a grossly higher value.  People ex rel. Wangelin v. Gillespie, 358 Ill. 40[, 192 N.E.2d 664 (1934)].

Within this constitutional limitation, however, the General Assembly has the power to determine the method by which property may be valued for tax purposes.  (See Anderson v. City of Park Ridge, 396 Ill. 235, 244[, 72 N.E.2d 210 (1947)].)  The constitutional provision for uniformity does not require that property be assessed on any particular day or on the same day (Heidenway v. Harding, 336 Ill. 606, 614[, 168 N.E.2d 630 (1929)]); nor does it call for a *mathematical equality.  The requirement is satisfied if the intent is evident to* adjust the burden with a reasonable degree of uniformity and if such is the effect of the statute in its general operation.  A practical uniformity, rather than an absolute one, is the test.  Crozer v. People ex rel. Hanberg, 206 Ill. 464[, 69 N.E. 489 (1903)]; 51 Am. Jur. 202, Taxation, sec.152." Apex Motor Fuel Co., 20 Ill. 2d at 401, 169 N.E.2d at 773.

IV.  Enactment of an *Ultra Vires* Cap or a Constitutionally Permissible Homestead Exemption?

Plaintiffs third appellate contention is that section 15-176 was enacted by the General Assembly *ultra vires*. See Lewis-Connelly v. Board of Education of Deerfield Public Schools,

1-05-1488

District 109, 277 Ill. App. 3d 554, 560, 660 N.E.2d 283, 287 (1996) (explaining that an *ultra vires* act is one which is an actor is not empowered to make and which act is, therefore, void). Plaintiffs argue that, while article IX, section 6, of the Illinois Constitution empowers the legislature to enact "homestead exemptions," section 15-176 is, instead, an "assessment cap" which the legislature is not constitutionally empowered to enact. Plaintiffs delineate the difference between the two terms by contending that section 15-176 "limits the taxable increase in valuation of a homestead parcel by 'exempting' a percentage of the *last* or *most recent* part of the property value. This is precisely the reverse of a true 'exemption,' which excludes from taxation the *first* or base part of the property's valuation." (Emphasis in original). Plaintiffs further purport that "the *one* factor that cannot be used in a genuine 'exemption' law is the assessed valuation of the property. Use of that factor to measure the amount of an 'exemption' throws a flexible exemption over the constitutional line and into the assessment/valuation side of the Revenue Article." (Emphasis in original).

We begin our consideration of plaintiffs' contentions by noting, as pointed out by defendants, that plaintiffs provide no citations to any authorities to demonstrate any settled meaning of "exemption" or to show how the scheme of section 15-176 falls short of any technical requirements so that it may not qualify as an "exemption." Plaintiffs, further, make no representations, even after defendant's waiver challenge, that their research revealed no applicable authority. Therefore, we will find plaintiffs to have waived their contentions through failing to supply proper argument as required by Supreme Court Rule 341(e)(7) (188 Ill. 2d R. 341(e)(7)); Eckiss v. McVaigh, 261 Ill. App. 3d 778, 786, 634 N.E.2d 476, 481 (1994) ("A reviewing court

-46-

is *** entitled to have issues clearly defined with pertinent authority cited and coherent arguments presented; arguments inadequately presented on appeal are waived. [Citation.] Mere contentions without argument or citation of authority do not merit consideration on appeal [citation], nor do statements unsupported by argument or citation of relevant authority"); People v. O'Malley, 356 Ill. App. 3d 1038, 1046, 828 N.E.2d 376, 384 (2005); see also In re E.H., 224 Ill. 2d 172, 180, 863 N.E.2d 231, 235 (2006) (noting that courts must avoid considering constitutional questions where the case can be decided on nonconstitutional grounds).

We further note, in any event, that there is authority suggesting, as noted in our previous discussion, that the term "homestead exemption" is a flexible one, which does not hinge upon formal structure. See McKenzie, 98 Ill. 2d at 106, 456 N.E.2d at 82. In McKenzie, our supreme court reversed the judgment of the circuit court where that court had determined that an enacted homestead improvement exemption did not qualify as a homestead exemption as contemplated under the Illinois Constitution. McKenzie, 98 Ill. 2d at 106-8, 456 N.E.2d at 82-84. In reaching its determination, the McKenzie court considered the views of constitutional convention delegate Karns, who stated " 'The language [allowing for the General Assembly to enact homestead exemptions] does not require or mandate any particular form of exemption but is a rather broad grant of power to the General Assembly to devise an equitable system of exemptions [and] rent credits.' " (Emphasis omitted.) McKenzie, 98 Ill. 2d at 106-07, 456 N.E.2d at 83, quoting 3 Proceedings of the Sixth Constitutional Convention 2080-81 (statements of Delegate Karns). More overridingly, in McKenzie, our supreme court rejected an *ultra vires* claim against a homestead improvement exemption which, like section 15-176, exempted the increase in the last

or most recent part of the property's value and not the first or base part. McKenzie, 98 Ill. 2d at 102-08, 456 N.E.2d at 81-84.

Conversely, in Hoffman v. Lehnhausen, 48 Ill. 2d 323, 327, 269 N.E.2d 465, 468 (1971), faced with an argument that a partial homestead exemption should be treated as a classification, our supreme court stated:

> "The defendants also take the position that the homestead exemption is merely a 'property valuation reduction' and not an exemption. A valuation reduction is a partial exemption, and if the value was reduced to zero, it would be a full exemption. Looking to the practical effect of the statute before us, we think it clear that section 3 of article IX of the 1870 constitution does not authorize the legislature to grant an exemption in the guise of a homestead 'valuation reduction.' "

Finally, we observe that there is no readily discernible basis on which to insist that homestead exemptions follow any particular form in order to be considered an "exemption," so long as they comport with the purpose of reducing the tax burden on homesteads. (Defendants, in fact, maintain a measure removing a part of a property's value from taxation as an alternative definition for "exemption.") Since the constitution would not appear to place any limit on the amount of a homestead exemption, so that, if it saw fit, the General Assembly could relieve homesteaders entirely from property taxation, *a fortiori*, any measure capping the amount of the valuation to be used in determining the tax would have to be acceptable. Plaintiffs attempted technical argument never addresses this consideration and, thus, would appear to attempt to elevate form over substance. See People v. Leach, 245 Ill. App. 3d 644, 653, 612 N.E.2d 825,

830 (1993) ("We will not elevate form over substance").

### V. Equal Protection/Special Legislation

Plaintiffs next argue that section 15-176 violates their right to equal protection under the law, including their right to not be disadvantaged by special legislation that is passed exclusively for the benefit of a different set of persons or entities. Like in their last argument, plaintiffs here, again, fail to present any authority specifically in support of their claims. In fact, plaintiffs do not even provide authorities setting out the general legal framework under which their claims should be evaluated. Their only citations to authority are to those cited by defendants in the proceedings below in an attempt to distinguish those cases. Hence, we must, again, find their contentions waived. See Eckiss, 261 Ill. App. 3d at 786, 634 N.E.2d at 481. However, in any event, we would also find their claims to be without merit.

Our supreme court has repeatedly recognized that mere unequal treatment in taxation will not implicate equal protection concerns; to merit relief, a plaintiff complaining of unequal protection must demonstrate an embodiment of invidious discrimination in his or her tax treatment. See Doran, 51 Ill. 2d at 559, 283 N.E.2d at 868, quoting Doolin v. Korshak, 36 Ill. 2d 521, 527-28 (1968) (" 'The governing principles are clear. "It is well established that the legislature has broad powers to establish reasonable classifications in defining subjects of taxation." [Citation.] The "prohibition of the Equal Protection Clause goes no further than the invidious [*sic*] discrimination." [Citation.] "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [Citation.] And "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support

it." [Citation.]' "); Schreiber v. County of Cook, 388 Ill. 297, 303, 58 N.E.2d 40, 43 (1944) ("Perfect equality and uniformity of taxation as regards individuals or corporations or different classes of property subject to taxation can hardly be visualized. Absolute equality is impracticable in taxation and is not required by the equal protection clause of the constitution. Inequalities that result occasionally and incidentally in the application of a system that is not arbitrary in its classification, and not applied in a hostile and discriminatory manner, are not sufficient to defeat the tax. [Citations.] Mere inequities in the administration of the law violate no constitutional rights. [Citation.]"). See also Ferguson v. Skrupa, 372 U.S. 726, 732, 10 L. Ed. 2d 93, 98, 83 S. Ct. 1028, 1032 (1963) ("it is only 'invidious discrimination' which offends the Constitution"). "Invidious discrimination is defined as a classification which is arbitrary, irrational, and not reasonably related to a legitimate purpose." Matter of B.N.B., 959 P.2d 989, 991 (Ok. Civ. App. 1998); accord McLaughlin v. Florida, 379 U.S. 184, 191-92, 13 L. Ed. 2d 222, 227-28, 85 S. Ct. 283, 288-89 (1964).

Plaintiffs contend that section 15-176 "creates irrational discriminations as against *** non-homesteader plaintiffs on whom the tax burden is arbitrarily shifted." Were this to be a valid example of invidious discrimination, however, then there could never be a valid homestead exemption: equal protection would necessarily trump the homestead exemption otherwise specifically provided for by our state constitution. And, we will not interpret one section of the constitution to render another section a nullity. Moreover, homestead exemptions survived a similar challenge in Doran, 51 Ill. 2d at 560, 283 N.E.2d 868. In Doran, our supreme court sated:

"We have heretofore recognized the inherent differences between lessors (those who hold

title) and lessees of personal property for the purposes of classification for taxation [citation], and plaintiff offers no rationale which prohibits the same application to owners and lessees of real estate. We therefore conclude that the homestead exemption for property assessed in the year 1972 and subsequent years does not violate the equal protection clauses under either the Federal or State constitutions." Doran, 51 Ill. 2d at 560, 283 N.E.2d 868.

As previously discussed, plaintiffs' other proffered examples of discrimination, likewise, have largely already been determined against them. For example, our supreme court found that whatever inequalities may result from Cook County's staggered assessment scheme among its three taxing districts were within constitutional limits in Apex Motor Fuel Co., 20 Ill. 2d at 401-02, 169 N.E.2d at 773 ("Plaintiff's argument based on fluctuation in real-estate values between the different quadrennial assessment years fails to show such a gross inequality as to render the act void"). As discussed previously, courts have also approved of different treatment between new and existing owners of homesteads. See Nordlinger v. Hahn, 505 U.S. at 12-13, 120 L. Ed. 2d at 13-14, 112 S. Ct. at 2333 ("the State has a legitimate interest in local neighborhood preservation, continuity, and stability. [Citation.] The State therefore legitimately can decide to structure its tax system to discourage rapid turnover in ownership of homes and businesses ***. By permitting older owners to pay progressively less in taxes than new owners of comparable property, the *** assessment scheme rationally furthers this interest. Second, the State legitimately can conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing owner. The State may deny a new

owner at the point of purchase the right to 'lock in' to the same assessed value as is enjoyed by an existing owner of comparable property, because an existing owner rationally may be thought to have vested expectations in his property or home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase"); accord Ball v. Village of Streamwood, 281 Ill. App. 3d 679, 665 N.E.2d 311 (1996).

Plaintiffs' only novel attempt at alleging invidious discrimination through section 15-176 appears to be through their claim that section 15-176 was an exercise of brute political strength by Cook County to shed its own legitimate tax burdens and to place them on the remaining counties in violation of local legislation principles. See Ill. Const. 1970, art. IV, §13 ("The General Assembly shall pass no special or local law when a general law is or can be made applicable"); Allen v. Woodfield Chevrolet, Inc., 208 Ill. 2d 12, 21-22, 802 N.E.2d 752, 758-59 (2003) ("The special legislation clause expressly prohibits the General Assembly from conferring a special privilege or benefit upon a person or group of persons while excluding others similarly situated. [Citation.] Although the legislature enjoys broad discretion in making statutory classifications, the legislature is prohibited, under the special legislation clause, from making arbitrary classifications which discriminate in favor of a select group without a sound and reasonable basis. [Citation.] Our analysis thus involves a dual inquiry. We must determine first whether the statutory amendments discriminate in favor of a select group and, if so, whether the classification created by the statutory amendments is arbitrary"). But, a "law may be general, and yet be operative in a single place. It is not requisite that it should be *** applicable to every person, or to every city," or other subsidiary political unit, "within the [s]tate." West Chicago

1-05-1488

Park Commissioners v. McMullen, 134 Ill. 170, 176, 25 N.E. 676 (1890).  Likewise, "an act is not local or special merely because it operates in only one place, if that is where the conditions necessary to its operation exist."  Apex Motor Fuel Co., 20 Ill. 2d at 405, 169 N.E.2d at 775.

We note that, throughout its appellate arguments, as well as in its complaint below, plaintiffs never allege that there were not local conditions surrounding property values in Cook County, different from those in any of the other counties in Illinois, to which the General Assembly could rationally have responded by enacting that section.  In fact, plaintiffs acknowledge that the debates surrounding section 15-176 focused on the particular need for tax relief in that vicinity.  They state in their brief: "The legislative debates disclose only an urgent effort to manufacture some tax relief for Chicago and, to a lesser extend, Cook County homeowners experiencing large assessment increases in *some* areas."  (Emphasis in original.)  See also 93d Ill. Gen. Assem., House Proceedings, May 5, 2004, at 29 (statements of Representative Fritchey) ("With respect to Cook County, this Bill is not about the rich and powerful.  This Bill is about a number of my neighbors who live within blocks from me who will have to sell their homes if this Bill doesn't pass.  This Bill is about people that stayed and fought for their communities to improve their communities over the years that want nothing more than the ability and the dignity to stay in their homes and not be forced out").  Thus, plaintiffs identify themselves a peculiar local problem suited to address by the General Assembly.

Moreover, while the legislature may have identified the rapidly rising property values in Chicago as its impetus in passing section 15-176, we note that there is no reason to believe that such a phenomenon would necessarily be restricted to that locale.  Section 15-176, of course,

-53-

would allow any other county to opt into its alternative exemption, in that case. Thus, section 15-176 on its face does not appear to exclude a benefit from others similarly situated as required by Allen in order to constitute impermissible special legislation. Allen, 208 Ill. 2d at 21, 802 N.E.2d at 758-59. Plaintiffs would reject our determination by contending that no other county is similarly situated to Cook County since no other county undergoes triennial assessments. However, as the triennial assessment procedure that could create a greater local need for tax relief, since property values will accrue more over time, has already been judicially approved (see Apex, 20 Ill. 2d at 401-02, 169 N.E.2d at 773), we fail to see how a statute that would remedy those particular, local conditions would amount to invalid special legislation. See Crusius v. Illinois Gaming Board, 348 Ill. App. 3d 44, 58, 807 N.E.2d 1207, 1221 (2004) ("Legislation that affects only one entity will be found constitutional provided there is a rational justification for its limited application and its narrow classifications are reasonably related to that justification").

## VI. Retroactivity

Plaintiffs' final contention is that the adoption of section 15-176 more than six months after the end of the 2003 tax year had the effect of retroactively increasing real property taxes on nonhomestead properties in a "harsh and oppressive" manner so that the increase was in violation of due process. While this contention still raises a constitutional issue, unlike in their previous arguments, here, plaintiffs do not claim to have already established an entitlement to judgment in their favor. Rather, they contend that the circuit court erred by interpreting relevant factors in evaluating their claim as elements and then dismissing their claim for failure to properly plead the existence of one or more misinterpreted elements. We disagree.

The parties agree that our supreme court set out the framework for evaluating whether retroactive tax legislation satisfied due process in Commonwealth Edison Co. v. Will County Collector, 196 Ill. 2d 27, 749 N.E.2d 964 (2001). In that case, our supreme court observed that a retroactive tax measure must be " ' "harsh and oppressive" ' " to violate due process. Commonwealth Edison Co., 196 Ill. 2d at 43, 749 N.E.2d at 974, quoting General Telephone Co. v. Johnson, 103 Ill. 2d 363, 379, 469 N.E.2d 1067 (1984), quoting Welch v. Henry, 305 U.S. 134, 137 83 L. Ed. 87, 93, 59 S. Ct. 121, 126 (1938). In order to determine whether retroactive tax measures were "harsh and oppressive," the Commonwealth Edison court instructed that one should look to whether the legislative purpose of the measure, specifically as to whether it was as a means of retribution against unpopular groups or individuals; the temporal length of the retroactivity; whether the taxpayer detrimentally relied on the previously existing law; and whether the taxpayer received adequate notice of the change in taxation. Commonwealth Edison, 196 Ill. 2d at 43-44, 749 N.E.2d at 974.

Plaintiffs argue that they pled a claim under this framework by alleging section 15-176's improper purposes in their uniformity and equal protection claims, by alleging that plaintiff Bernshteyn purchased a home prior to section 15-176 going into effect, and "[b]y alleging that they have been deprived of money by virtue of defendants' retroactive application of the 7% Cap, including its retroactive application to real estate transaction which had closed prior to the law's enactment." However, we have already found in our evaluation of plaintiffs' uniformity and equal protection claims that section 15-176 did not embody any improper purpose, let alone a means of retribution. Further, we agree with defendants that plaintiffs cannot demonstrate any lack of

substantial notice or detrimental reliance.

The legislative record reflects that the organizational plaintiffs were actively involved in the fight against section 15-176's passage. 93d Ill. Gen. Assem., Senate Proceedings, May 25, 2004, at 23 (statements of Senator Lauzen) (stating prior to the vote on what would be codified as section 15-176, "Just to read off some of the opponents: *** Chicagoland Chamber of Commerce, *** Chicago Development Council, *** the Building Owners and Managers Association of Chicago"); 93d Ill. Gen. Assem., House Proceedings, May 5, 2004, at 11 (statements of Representative Winters) ("I have one analysis . . . just to put a number out there, and again this is based on assumptions by the Chicagoland Chamber ***") . While plaintiffs argue that their knowledge of the General Assembly's consideration of the measure is not equivalent to their knowledge of the measure becoming law, this view is contrary to established precedent. See United States v. Darusmont, 449 U.S. 292, 299, 66 L. Ed. 2d 513, 519, 101 S. Ct. 549, 553 (1981) ("Assuming, for purposes of argument, that personal notice is relevant, appellee is hardly in a position to claim surprise at the 1976 amendments to the minimum tax. The proposed increase in rate had been under public discussion for almost a year before its enactment. *** Appellee, therefore, had ample advance notice of the increase in the effective minimum rate"). Thus, the "commercial, industrial and non-homestead" property owners had sufficient notice of the potential tax changes that could come about through passage of section 15-176.

Finally, as a matter of law, the "commercial, industrial and non-homestead" property owners can show no detrimental reliance. In evaluating detrimental reliance in the case before it, the Commonwealth Edison court noted the distinction between a taxpayer being subject to an

1-05-1488

adjusted amount of an existing tax as compared with being subject to an entirely new tax, stating:

> "Edison knew that, under either the old or new versions of sections 5-1024 and 9-107, it would be obligated to pay 1994 county property taxes. The only question was how much its tax bill would be. Edison's position would be *** more an upsetting of 'settled expectations,' if an entirely new tax, rather than a new tax rate, were being imposed by the amendments to section 5-1024 and 9-107. This important distinction between a new, retroactive tax rate and a new, retroactive tax has been frequently noted:
>
> ' "Nobody has a vested right in the rate of taxation, which may be retroactively changed at the will of Congress at least for periods of less than twelve months; Congress has done so from the outset . . . . The injustice is no greater than if a man chance to make a profitable sale in the months before the general rates are retroactively changed. Such a one may indeed complain that, could he have foreseen the increase, he would have kept the transaction unliquidated, but it will not avail him; he must be prepared for such possibilities, the system already being in operation. His is a different case from that of one who, when he takes action, has no reason to suppose that any transactions of the sort will be taxed at all." ' United States v. Darusmont, 449 U.S. 292, 298, 66 L. Ed. 2d 513, 518-19, 101 S. Ct. 549, 552-53 (1981), quoting Cohan v. Commissioner, 39 F.2d 540, 545 (2d Cir. 1930) (Hand, J.)." (Emphasis omitted.) Commonwealth Edison, 196 Ill. 2d at 48-49, 749 N.E.2d at 977.

So too here, the "commercial, industrial and non-homestead" property owners identified in plaintiffs' brief as those being deprived of due process knew that some form of homestead

exemption would impact their share of the tax burden; it was only a question of to what extent. Section 15-176 imposed no new tax upon the identified plaintiffs. Therefore, even if the considerations our supreme court set out in Commonwealth Edison were only factors, not elements, those factors necessarily weigh against plaintiffs; there is no need for a remand for factual development and the circuit court's dismissal of the retroactivity count was proper.

VII. Conclusion

For all the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

McNULTY, J., and FITZGERALD SMITH, P.J., concur.